UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

SACRED FEATHER, et al.,            )
                                   )
            Plaintiffs,            )
                                   )
     v.                            )  Civil No. 07-18-B
                                   )
JEFFREY MERRILL, et al.,           )
                                   )
            Defendants.            )

**Recommended Decision on Motion to Dismiss and Motion for Summary Judgment of Defendant Dardis (Docket No. 28)**

The plaintiffs in this action are prisoners at the Maine State Prison seeking declaratory judgment, injunctive relief, and compensatory damages because they assert that they were not provided reasonable accommodations as Native American inmates to practice their religion. They are referred to in the Second Amended complaint by the collective name "Sacred Feather."[1] The plaintiffs – Michael Thompson, Cody Choneska, Jeremy Stevens, Albert Stanley, Albert Hanois, Gary Tanguay, Kenneth Larkin, Jacob Lovejoy, James Trott and Richard Burdick -- frame their claims as arising out of their First and Fourteenth Amendment rights under the United States Constitution.[2] They also assert an infringement of their rights under the Protection of Religious Exercise in Land Use and By Institutionalized Persons Act.

In this dispositive motion Defendant Leida Dardis seeks a determination that the plaintiffs cannot recover compensatory damages and judgment on all of the plaintiffs' claims

---

[1]  The motion regarding the second amended complaint explained that Sacred Feather is not a formal registered association and should not have been listed as a plaintiff. Thus, that party was terminated on August 2, 2007, with the granting of the motion to amend, although Sacred Feather has remained the lead plaintiff apropos the header.

[2]  (See Sec. Am, Compl. at 1.)

against her. In a separate memorandum, I have recommended dismissing all the plaintiffs' claims because of their failure to administratively exhaust them except those against Dardis pertaining to the need for a shelter for their ceremonies, the right to have pow wows and feasts, the availability of a sweat lodge, and an entitlement to more funding. In responding to this motion the plaintiffs make it quite clear that they are now only pressing a First Amendment free exercise of religion clause claim against Dardis.

## DISCUSSION

*Summary Judgment Standard*

"At the summary judgment stage," the United States Supreme Court explained in Scott v. Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed. R. Civ. Proc. 56(c)). Scott reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). Davenport cannot defeat summary judgment by relying on "'conclusory allegations, or rank speculation.'" Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007) (quoting Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006)); see also Fiacco v. Sigma Alpha Epsilon Fraternity, __ F.3d __, __, 2008 WL 2390406, __ (1st Cir. Jun. 13, 2008)(courts ignore

conclusory allegations, improbable inferences, and unsupported speculation) (quotations and citations omitted).

*Material Facts*[3]

Defendant Dardis is the Deputy Warden for Prisoner Services at the Maine State Prison and has been since August of 2003. (SMF ¶ 1; Resp. SMF ¶ 1.) While she has the overall responsibility for the religious services program for prisoners at this facility, it is the Commissioner of Corrections who has the final say on all aspects of the operation of the program. (SMF ¶ 2; Dardis Aff. ¶ 2.)

An outdoor shelter is provided for Native American sacred pipe and smudging ceremonies. (SMF ¶3; Dardis Aff. ¶ 3.) It was built in the first half of 2004 and consists of a circular set of benches with a roof over the entire circle. (SMF ¶ 4; Resp. SMF ¶ 4.) Although there have been occasional complaints from Native American prisoners that other persons have made derogatory comments when passing by the shelter during the ceremonies, they have never identified any particular persons as having made these comments and so it has been impossible to take disciplinary action. (SMF ¶ 5; Resp. SMF ¶ 5.) In addition, the chaplain and religious volunteers from the community who have attended the outside ceremonies have not reported any problems in this regard. (SMF ¶ 6; Resp. SMF ¶ 6.) There is no requirement that the outdoor shelter be used for these ceremonies as an indoor location has been made available for the smudging and sacred pipe ceremonies since at least January of 2007. (SMF ¶ 7; Dardis Aff. ¶ 5.) Originally, this was a small room near the chapel and next to where all the religious faith groups store group ceremonial items. (SMF ¶ 8; Resp. SMF ¶ 8.)

---

[3] The plaintiffs have not put forward any additional statements of fact.

In January of 2008, due to numerous complaints from staff and other prisoners that the smoke from these ceremonies was getting into the prison ventilation system and causing them health issues, the indoor location was changed to the only room in the facility that is not connected to the ventilation system. (SMF ¶ 9; Dardis Aff. ¶ 5.) The new room is larger than the room used previously, has outdoor light unlike the room used previously, and is also a room that few other persons pass by. (SMF ¶ 10; Dardis Aff. ¶ 5.)

No public monies have ever been used to fund any prisoner group, including any religious faith group. (SMF ¶ 11; Resp. SMF ¶ 11.) Every prisoner group has been funded by either dues collected by the group from its members, fundraising activities organized by the group, such as the selling of greeting cards (though more often funds raised this way are donated by the group to an outside charity), contributions from persons or groups in the community, or a combination of these. (SMF ¶ 12; Resp. SMF ¶ 12.) At one time, various Protestant and Catholic groups in the community regularly donated funds that they earmarked for their counterpart prisoner groups. (SMF ¶ 13; Resp. SMF ¶ 13.) In June of 2004, defendant Dardis had these outside groups notified that donated funds would be used in the future for all prisoner religious faith groups, with the result that there was a virtual cessation of donations. (SMF ¶ 14; Resp. SMF ¶ 14.) Under the present Department of Corrections policy, Policy 24.3, Religious Services, General Guidelines, Procedure G.2., the only donations that may now be accepted are of religious publications and other items for use in the religious services program. (SMF ¶ 15; Resp. SMF ¶ 15.) Chaplain Walter Foster, who started working at the Prison in May of 2006, oversees the donated funds that were left over from before June of 2004 and the few that came in later. (SMF ¶ 16; Resp. SMF ¶ 16.) Defendant Dardis instructed him to use those funds

equitably with respect to all the prisoner religious faith groups and has had no complaints that he has done otherwise. (SMF ¶ 17; Resp. SMF ¶ 17.)

In August of 2005, the Native American prisoners were allowed to have a pow wow and feast. (SMF ¶ 18; Dardis Aff. ¶ 9.) This involved all general population Native American prisoners, including those who do not ordinarily eat at the same time, being allowed to gather together, away from other prisoners, to eat a lunch meal consisting of the same food items offered to other prisoners that day. (SMF ¶ 19; Resp. SMF ¶ 19.) As well, religious volunteers from the community attended and provided ceremonial music, conducted smudging and sacred pipe ceremonies, and generally oversaw the pow wow. (SMF ¶ 20; Resp. SMF ¶ 20.) As far as Dardis knows, all aspects of a traditional Native American pow wow were included, except that wild game foods were not allowed. (SMF ¶ 21; Dardis Aff. ¶ 9.) The decision to not allow wild game foods or any special ceremonial feast foods to any religious faith group was made by the Commissioner of Corrections. (SMF ¶ 22; Resp. SMF ¶ 22.) The Native American prisoners have been offered the opportunity to have additional yearly pow wows but have not requested one since. (SMF ¶ 23; Dardis Aff. ¶ 9. ) There is no provision of special ceremonial feast foods for Christian holidays, and, for the past several years, ham has not been served on Easter and neither turkey nor ham has been served on Christmas. (SMF ¶ 24; Resp. SMF ¶ 24.)

The past decision to not allow a sweat lodge ceremony at the Prison was made by the Commissioner of Corrections. (SMF ¶ 25; Dardis Aff. ¶ 11.) However, he revised Policy 24.3 on February 28, 2008, to allow a sweat lodge ceremony. (SMF ¶ 26; Resp. SMF ¶ 26.) This will be provided once the advisory group mentioned in the policy is formed and provides its recommendations on how to conduct the ceremony. (SMF ¶ 27; Resp. SMF ¶ 27.) It is the understanding of Dardis that names of proposed members for this group have been solicited, and

5

she expects that the first sweat lodge ceremony at the Prison will take place sometime in the next month.  (SMF ¶ 28; Dardis Aff. ¶ 11.)

*The Plaintiffs' Affidavit Statements Meant to Controvert Dardis's Facts*

The plaintiffs challenge a number of the above statements of facts by citing to the following unsworn affidavit statements.

**Jacob Lovejoy Affidavit**

I have grieved, through Grievance Form 1 that Leida Dardis has intentionally denied my religious practice.  (Lovejoy Aff. ¶ 3.)  The nature of the grievance was that Leida Dardis intentionally obstructed me in the enjoyment of the free exercise of my religious belief.  (Id. ¶ 5.) I have also grieved regarding the smudge in the closet and Ms. Dardis has told me it doesn't apply to me.  (Id. ¶ 7.)

I filed a grievance regarding the outdoor structure recently provided for our sacred ceremonies.  (Id. ¶ 8.)[4]  The nature of the grievance was that the structure was a really a tool shed and was too small for our needs.  (Id. ¶ 9.)  The tool shed had many negative characteristics.  It was too small. Many of us had to stand outside in the weather. (Id. ¶ 10.) The tools were removed but the hanging apparatus for the tools was always in my way.  (Id. ¶ 11.)  Previously, we were allowed to enjoy a room similarly enjoyed by the Protestants and Catholics.  (Id. ¶ 12.) [The Grievance Officer] said it didn't affect me because I refused to engage in my spiritual expression in a cramped tool shed.  (Id. ¶ 16.)  The tool shed was used twice by our group, Sacred Feather.  (Id. ¶ 17.)  Both times the fire alarm went off, forcing us to stop our ceremony. (Id. ¶ 18.)  We needed to remove all of our ceremonial items and we needed to go out into the

---

[4] The plaintiffs actually do not cite to Paragraph 8 of Lovejoy's affidavit (Resp. SMF ¶ 10) but it is necessary context.

snow. (Id. ¶ 19.) Prior to our first attempt to use the shed, we were told that lighting the smudge would set off the fire alarm. (Id. ¶20.) The fire alarm did go off. (Id. ¶ 21.) The corrections officers forced us to abruptly terminate our ceremony and go out into the snow until the alarm stopped. (Id. ¶ 22.) As a result, we were not able to perform the smudge. (Id. ¶ 23.) This occurred on two occasions. (Id. ¶ 24.) Though the administration knew it would happen, this is the only location provided to us to conduct our ceremony. (Id. ¶25.)

### Michael Thompson Affidavit

Prior to filing this lawsuit, Cote Choneska, Richard Burdick and I sat down with Tony Mendez to construct a new agreement between the prison administration and Sacred Feather. (Thompson Aff. ¶26.) The old agreement had expired, as it had an expiration date of 2006. (Id. ¶27.)[5] My group asked for everything in the old agreement and added the sweat lodge and pow wows to be held several times a year. (Id. ¶28.) Leida Dardis denied everything. (Id. ¶29.) No explanation was given. (Id. ¶ 30.) She never said it was the Commissioner that said no. (Id. ¶31.) The denial came from Leida Dardis herself, it did not come from the Commissioner's office and we were not told it came from the Commissioner's office. (Id. ¶ 32.) We were told it came from Leida Dardis herself. (Id. ¶ 33.) The gazebo that we have outside does not protect us from the elements. (Id. ¶ 34.) The prison let us smudge inside for a short time until one person complained. (Id. ¶ 37.) We can now only smudge out in the tool shed or outside. (Id. ¶ 38.) The prison never allows us to use the chapel. (Id. ¶ 39.)

---

5   Paragraphs 26 and 27 are not referenced in the plaintiffs' responsive statements but they help the reader understand the paragraphs that are referenced.

**Richard Burdick Affidavit**[6]

I wish to follow several religious ceremonies, including but not limited to, Mid-Winter Ceremony, which is a reading of the Code, dream guessing, and the peach bowl game. I have been denied all of these ceremonies. (Burdick Aff. ¶ 4.) I have been denied mid-June first fruit ceremonies, which is eating strawberries and drinking strawberry juice. A short reading of the Code and moral values of the tribe are discussed. (Id. ¶ 5.) I have been told the food can't be brought in. I have asked and have been denied. (Id. ¶ 6.) I asked Chaplain Foster and he denied the request. (Id. ¶ 7.) I asked Chaplain Foster "Don't the Catholics celebrate Communion?" His response was yes they do. (Id. ¶ 8.) I asked, "Who brought it in?" His response was the Priest brings the wine in and they have it. (Id. ¶ 9.) Chaplain Foster said the difference was that they are Christians and I am not. (Id. ¶ 10.) The prisoners are not allowed the Three Sisters for ceremony, the beans, corn, and squash have never been provided. These are common foods. (Id. ¶ 15.)

*Dardis's Argument*

**Availability of Compensatory Damages**

Dardis first argues that the Court should rule that the plaintiffs cannot recover compensatory damages because of 42 U.S.C. § 1997e(e) which provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). I addressed the concern in Libby v. Merrill, Civ. No. 03-B-W, 2003 WL

---

[6]   The Burdick Affidavit is electronically notarized by Burdick. Assuming Burdick is a notary he cannot notarize his own affidavit.

21756830, 3 -4 (D.Me. July 29, 2003), aff'g 2003 WL 22669017 (D. Me. Nov. 7, 2003) with regards to a free exercise of religion claim and relied on the following Seventh Circuit reasoning:

> Indeed, in the context of First Amendment claims, we have held explicitly that prisoners need not allege a physical injury to recover damages because the deprivation of the constitutional right is itself a cognizable injury, regardless of any resulting mental or emotional injury. Rowe v. Shake, 196 F.3d 778, 781-82 (7th Cir.1999); see also Searles v. Van Bebber, 251 F.3d 869, 879-81 (10th Cir.2001) (nominal and punitive damages for First Amendment violation not barred); Allah v. Al-Hafeez, 226 F.3d 247, 252 (3d Cir.2000) (same); Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir.1998) (any form of relief for First Amendment violations available, if not for mental or emotional injury). Using a similar rationale, several of our sister circuits have concluded that § 1997e(e) does not bar all recovery for violations of due process or the right to privacy. See Thompson v. Carter, 284 F.3d 411, 418 (2d Cir.2002) (nominal and punitive damages available for deprivation-of-property claim); Oliver v. Keller, 289 F.3d 623, 630 (9th Cir.2002) (compensatory, nominal, or punitive damages available if premised on alleged unconstitutional conditions of pretrial confinement, and not emotional or mental distress suffered); Doe v. Delie, 257 F.3d 309, 314 n. 3 & 323 (3d Cir. 2001) (nominal and punitive damages available for violation of inmates' newly recognized right to medical privacy); but cf. Harris v. Garner, 190 F.3d 1279, 1282, 1287-88 & n. 9 (§ 1997e(e) precludes compensatory and punitive damages for alleged violations of Fourth, Eighth, and Fourteenth Amendments, but expressing no view on nominal damages), vacated & reh'g en banc granted, 197 F.3d 1059 (11th Cir.1999), reinstated in pertinent part, 216 F.3d 970 (11th Cir.2000); Davis [v. District of Columbia], 158 F.3d [1342,] 1348-49 [(D.C. Cir. 1998)](compensatory and punitive damages for violations of constitutional right to privacy barred, but expressing no view on nominal damages). These decisions reflect an emerging view that § 1997e(e), as the plain language of the statute would suggest, limits recovery "for mental and emotional injury," but leaves unaffected claims for nominal and punitive damages, which seek to remedy a different type of injury. See Robinson [v. Page], 170 F.3d [747,]748 [(7th Cir. 1999)].

Calhoun v. DeTella, 319 F.3d 936, 940-41 (7th Cir. 2003). See also Mayfield v. Texas Dept. Of Criminal Justice, __ F.3d __, __ 2008 WL 2222066, *3 (5th Cir. 2008) (explaining that Odinist claims for compensatory damages stemming from restrictions on practice of religions in prison were barred by § 1997e(e)). In Libby I recommended following this emerging view, denied the motion to dismiss on § 1997e(e) grounds, and noted that the plaintiff could not recover

compensatory damages for his emotional injury. 2003 WL 21756830 at 2-3. Calhoun has also been followed by Judge DiClerico in the District of New Hampshire. Goodrich v. Rouleau, Civ. No. 02-314 JD, 2003 WL 1392433, 2 (D.N.H. Mar. 20, 2003).

In Shaheed-Muhammad v. Dipaolo, Judge Gertner addressed this question in the context of a motion for judgment on the pleadings and concluded: "Where the harm that is constitutionally actionable *is* physical or emotional injury occasioned by a violation of rights, § 1997e(e) applies. In contrast, where the harm that is constitutionally actionable is the violation of intangible rights-regardless of actual physical or emotional injury-section 1997e(e) does not govern." 138 F.Supp.2d 99, 107 (D. Mass. 2001). In 2005, Judge Gertner, noting that the First Circuit had not addressed the issue and describing the circuit split, reaffirmed her view on the question in ruling on a motion for summary judgment. Shaheed-Muhammad v. Dipaolo, 393 F.Supp.2d 80, 107 -08 (D. Mass. 2005). This opinion concluded that the plaintiff could seek compensatory damages relying on Rowe v. Shake, 196 F.3d 778, 781 (7th Cir.1999)[7] and Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir.1998).

Since I last visited the question in Libby the Eighth Circuit has sided with the Seventh Circuit,

> concluding Congress did not intend section 1997e(e) to limit recovery only to a select group of federal actions brought by prisoners. Instead, we read section 1997e(e) as limiting recovery for mental or emotional injury in all federal actions brought by prisoners. In reaching this conclusion, we cannot escape the unmistakably clear language Congress used: "No Federal civil action may be brought by a prisoner ... for mental or emotional injury ... without a prior showing of physical injury." To read this statute to exempt First Amendment claims would require us to interpret "[n]o Federal civil action" to mean "[n]o Federal civil action [except for First Amendment violations]." If Congress desires such a reading of section 1997e(e), Congress can certainly say so. We cannot.

---

[7] The Seventh Circuit cited this case in support of its conclusion in Calhoun.

10

Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004). Interestingly, this was over a dissent that cited Shaheed-Muhammad and argued that § 1997e(e) was inapplicable to First and Fourteenth Amendment claims, noting that First Amendment claims are "based on a deprivation of an intangible right," "not linked to the existence or severity of [] mental or emotional, and perhaps even physical injury but § 1983 claims for First Amendment violations are not brought to redress such injuries. They are brought to redress the actual violation of the right. " Id. at 730 (Heaney, Cir. J., dissenting).

Until the Supreme Court or the First Circuit says otherwise, I continue to follow Calhoun and conclude that these plaintiffs are not able to claim compensatory damages for their claims. The plaintiffs have not claimed entitlement to nominal or punitive damages so only their claims for declaratory and injunctive relief would survive.

**Merits Argument**

Dardis argues in her dispositive motion that she is entitled to summary judgment as to all the plaintiffs' remaining claims. In their response to this motion the plaintiffs make it quite clear that: "This is a lawsuit under the First Amendment free exercise of religion clause." (Opp'n Mem. at 3.) "Defendant Dardis," they opine, "may deny that she is the one obstructing the Native Americans … free right of religion, nevertheless it is a question of material fact given that each of the three named Plaintiffs[8] were told that it was Deputy Warden Dardis who was denying them their rights under the First Amendment." (Id.)[9] Holding the plaintiffs to the affidavit

---

[8] I am not sure whether or not counsel intends to concede that there are only three plaintiffs with tenable claims against Dardis.

[9] With regards to the second amended complaint's Fourteenth Amendment equal protection claim and the Religious Exercise in Land Use and By Institutionalized Persons Act claim: "[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived." Grenier v. Cyanamid Plastics, 70 F.3d 667, 678 (1st Cir. 1995). See also Berry v. City of South Portland, 525 F.Supp. 2d 214,233 (D. Me. 2007); Dressler v. Cmty. Serv.

11

statements set forth above, the only dispute of fact that would be generated by the plaintiffs is one pertaining to the adequacy of the shelter provided for their indoor ceremonies and the opportunity to have feasts.[10] These affidavit statements do not address pow wows, funding, and the availability of a sweat lodge.

Quite remarkably neither side has cited a single case regarding the merits of the plaintiffs' claims.[11] It does not take much research to find cases on point. For instance, the United States Supreme Court addressed a free exercise of religion claim brought by incarcerated members of the Islamic faith in O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987). The plaintiffs challenged policies "which resulted in their inability to attend Jumu'ah, a weekly Muslim congregational service." Id. at 345. The Court explained:

> Several general principles guide our consideration of the issues presented here. First, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545 (1979). See Turner v. Safley, 482 U.S. 78, 84 (1987); Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 129 (1977). Inmates clearly retain protections afforded by the First Amendment, Pell v. Procunier, 417 U.S. 817, 822 (1974), including its directive that no law shall prohibit the free exercise of religion. See Cruz v. Beto, 405 U.S. 319( per curiam ). Second, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948). The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives-including deterrence of crime, rehabilitation of prisoners, and institutional security. Pell v. Procunier, supra, 417 U.S., at 822-823; Procunier v. Martinez, 416 U.S. 396, 412 (1974).
> In considering the appropriate balance of these factors, we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, "who are actually charged with and trained in the

---

Commc'ns, Inc., 275 F. Supp. 2d 17, 26 (D. Me. 2003); see also Davenport v. City of Caribou, Civ. No. 7-36-B-W, 2008 WL 2223289, 1 n.1 (D. Me. 22, 2008) (recommended decision).

[10] The Burdick Affidavit addresses the feast issue head-on. Burdick is a plaintiff, and, although he did not personally grieve this complaint the defendants concede that this issue has been fully grieved. Burdick would be able to testify on this score at a trial.

[11] The only case that Dardis cites is a recommended decision by me addressing 42 U.S.C. § 1997e(e). She cites no cases in her reply memorandum. The plaintiffs do not cite a single case in their opposition memorandum.

> running of the particular institution under examination." Bell v. Wolfish, supra, 441 U.S., at 562. See Turner v. Safley, supra, 482 U.S., at 86-87. To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. See, e.g., Jones v. North Carolina Prisoners' Labor Union, Inc., supra, 433 U.S., at 128. We recently restated the proper standard: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, supra, 482 U.S., at 89. This approach ensures the ability of corrections officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," ibid., and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to "resolution by decree." Procunier v. Martinez, supra, 416 U.S., at 405. See also Turner v. Safley, supra, 482 U.S., at 89; Bell v. Wolfish, supra, 441 U.S., at 548.

Id. at 348-350 (1987) (footnote omitted). In an unpublished decision, Street v. Maloney, No. 92-1822, 1993 WL 125396 (1st Cir. April 23, 1993) the First Circuit addressed a claim by a Hare Krishna practicing inmate whose prayer beads were confiscated and applied O'Lone v. Estate of Shabazz and Turner[12] in overturning the District Court's grant of summary judgment to the defendants. See also Mayfield, 2008 WL 2222066 (addressing a First Amendment free exercise of religion claim by a prisoner who challenged limitations on his Odinist group's religious assemblage rights and the ability to possess runestones and to access rune literature, applying Turner and O'Lone).

Under Turner this court considers four factors: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation ... will have on guards and other inmates, and on the allocation of prison resources generally"; (4) whether there are "ready alternatives that

---

[12] The Panel assumed "arguendo" that the Turner rubric applied to the individualized decision in question. Street, 1993 WL 125396 at *3.

13

could fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."  Turner, 482 U.S. at 89-91 (internal citations and quotation marks omitted).  With respect to the first inquiry, Turner also indicated that the government's objective must be legitimate and it is "important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion."  Id. at 90.  The Fifth Circuit describes this as a neutrality requirement.   Mayfield, 2008 WL 2222066 at *5.

I do not think that Dardis can rely entirely on her assertion that the Commissioner made these decisions as a way of edging her way completely out of this law suit.  She admits that she has the overall responsibility for the religious services program for prisoners at this facility.  The affidavit statements support an inference that she, in particular, was involved in the decisions made about Sacred Feather and was in a position to instruct the chaplain on matters of this ilk.

Had the plaintiffs presented cognizable affidavits, the following factual dispute would be before the court. With regards to ceremonial feasts, Dardis asserts that there is no provision of special ceremonial feast foods for Christian holidays.  The plaintiffs' relevant fact is that Chaplain Foster said that Catholics celebrate communion with wine brought in by the priest and indicated that the difference between Sacred Feather and the Catholics regarding such allowance was that they are Christians and Burdick was not.  The prisoners are not allowed the Three Sisters for ceremony, the beans, corn, and squash have never been provided.  These are common foods.  Regarding the shelter, Dardis asserts that -- due to numerous complaints from staff and other prisoners that the smoke from these ceremonies was getting into the prison ventilation system and causing them health issues -- the indoor location for Sacred Feather's ceremony was changed to the only room in the facility that is not connected to the ventilation system.  According to her the new room is larger than the room used previously, has outdoor light unlike

14

the room used previously, and is also a room that few other persons pass by.  In response the plaintiffs argue that the tool shed had many negative characteristics – it is too small so many participants have to stand outside in the weather and the hanging apparatus for the tools get in the way.  The gazebo provided for outdoor ceremonies does not protect the plaintiffs from the elements.  The plaintiffs suggest that only one person complained about the smoke and this was the trigger for the move outside.  They add that the prison never allows them to use the chapel.

I think it is fair to conclude that this is the factual challenge that the plaintiffs would make at trial, especially as they have elected not to propound any additional facts.  That said, I also think it is only fair to disregard the affidavits and decide whether or not Dardis is entitled to summary judgment based on the facts set forth by Dardis.  The plaintiffs are represented by counsel who has been involved with numerous civil rights cases in this District and who is well aware of the Federal Rules of Civil Procedure as well as the District's local rules.   Federal Rule of Civil Procedure 56(e) requires that affidavits be sworn or certified.  In addition, once the defendants filed their replies to this motion and the summary judgment motion filed by all the defendants based on non-exhaustion -- flagging the issue -- counsel took no steps to get this court's leave to remedy the defect.

This approach leaves the Court with Dardis's facts and the following argument made by the plaintiffs:

> Defendant Dardis suggests that summary judgment should be found in her favor as she is not responsible for any of the violations alleged in the complaint. Again, the Plaintiffs refer to their Affidavits. Specifically, Affidavit of Michael Thompson ¶¶28-33. It was Defendant Dardis who denied the Plaintiffs' request for a sweat lodge and a pow wow to be held several times a year. In her denial, she never stated that it was the Commissioner. The denial came from Ms. Dardis herself. In a grievance filed by Plaintiff Thompson, he stated that he was intentionally being denied the enjoyment of his religious beliefs by Defendant Dardis. Affidavit of Michael Thompson ¶53. Also note: Defendants' Exhibit

> Docket Number 27-3, Michael Thompson's Grievance Form in which he states, "Deputy Warden Leida Dardis is intentionally obstructing me in the enjoyment of the free exercise of my religious beliefs in violation of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983 and 18 U.S.C. §242." Further on in that same grievance, Plaintiff Thompson states "On April 5, 2006 acting religious liaison, Sgt. Anthony Mendez informed Chief Cote Choneska that Deputy Warden Leida Dardis had denied portions of the proposal." An exactly similar allegation lies in the grievance form of Jacob Lovejoy. See Defendants' Document 27-3, as well as the grievance form of Cote Choneska, who references the exact same grievance.
>
> Defendant Dardis may deny that she is the one obstructing the Native Americans their free exercise of religion, nevertheless it is a question of material fact given that each of three of the named Plaintiffs were told that it was Deputy Warden Dardis who was denying them their rights under the First Amendment.

(Mem. Opp'n at 2-3.) This is really the extent of the plaintiffs' argument on the merits. At this stage of the game their case is limited to a First Amendment challenge as to the responses made to their requests for a better indoor room for their ceremonies and to the availability of certain foods for feasts.

By neglecting to address the governing standard for analyzing these claims both sides of the dispute have done an inadequate job of focusing in on the facts key to the resolution of this dispute. There is no genuine dispute that there is no provision of special ceremonial feast foods for Christian holidays, and, for the past several years, ham has not been served on Easter and neither turkey nor ham has been served on Christmas. This suggests a "neutral" application of a general policy pertaining to special ceremonial foods. Compare Mayfield, 2008 WL 2222066 at *6. However, Dardis has made no case as to whether there are alternative means of exercising the free exercise of religion right, nor has she addressed the impact making an accommodation would have on guards and other inmates or the allocation of prison resources generally. On this record I have no clue as to whether there are ready alternatives that could fully accommodate the prisoner's rights at de minimis cost to valid penological interests. With respect to the alternative

16

means, it is self-evident that a prisoner cannot obtain the ceremonial foods by other means if the prison is forbidding them that right.  The court has no way of discerning from this record what the impact would be on the guards, the other inmates, or the allocation of prison resources.  The question of ready alternatives does not seem to be applicable but the bottom line is, it is impossible to decide on this record.  The problem is that the plaintiffs concede that this particular decision to not allow wild game foods or any special ceremonial feast foods to any religious faith group was made by the Commissioner of Corrections. (SMF ¶ 22; Resp. SMF ¶ 22.)   The plaintiffs have not named the Commissioner as a defendant and thus this aspect of the claim against Dardis goes nowhere.

With respect to the provision of indoor space, it is fair to infer that Dardis had some role in making these arrangements.  Dardis has explained that the indoor space provided to the plaintiffs was identified after there was at least one complaint of smoke in the ventilation system and that the space chosen was so chosen because it was the only space not connected to the ventilation system.  As to this claim it is the plaintiffs who have not met their Turner burden of at least creating a dispute that there is an alternative solution open to the prison.  It takes little imagination to deduce that this issue would implicate the allocation of prison resources and question of ready alternatives Turner inquiries, but neither side has bothered to till this terrain.  Had the plaintiffs properly supported their responsive statements of fact there would be a material dispute on the question of whether or not this is really an adequate space given the question of whether or not all members of the group can fit in the space, the obstruction caused by the tool hanging apparatus, and the issue of the fire alarms.

In sum, this is a vexing presentation of facts and arguments by both parties.  In such a situation the Court must exercise its discretion (and patience) in arriving at a disposition.  See

Livick v. The Gillette Co., 524 F.3d 24, 28 (1st Cir. 2008).  I conclude that the best approach to this state of affairs is to limit the plaintiffs' claims to those supported by the inadmissable affidavits – the ceremonial feasts claim and the indoor shelter claim as against Dardis– and to grant summary judgment to Dardis on all claims.  In reaching this conclusion I stress that I am not considering the plaintiffs' affidavit statements as part of the record; the call would be closer if the Court were to consider the affidavit statements admissible.  However, even after the defendants pointed out the obvious defect in the presentation, plaintiffs' counsel has made no attempt to remedy the situation.  The "affidavits" are neither sworn under oath nor affirmed under penalty of perjury and it would be contrary to Rule 56 (e) for me to recommend denying summary judgment on the issue of the provision of indoor space for religious ceremonies based upon those documents.

## *Conclusion*

I recommend that the Court grant this dispositive motion on the question of compensatory damages and on the merits of all of the plaintiffs' claims against Dardis.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

June 19, 2008                             /s/ Margaret J. Kravchuk
                                          U.S. Magistrate Judge